# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49444-2-II |
| Respondent, | Consolidated with No. 49530-9-II |
| v. | |
| MICHAEL EUGENE ROWLAND, | UNPUBLISHED OPINION |
| Appellant. | |
| STATE OF WASHINGTON, | |
| Respondent, | |
| v. | |
| MAZZAR GERALD ROBINSON, | |
| Appellant. | |

PENOYAR, J.[*] — A jury convicted Mazzar Robinson and Michael Rowland of one count

each of first degree felony murder, first degree burglary, and first degree attempted robbery.

---

[*] Judge Joel M. Penoyar is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

Robinson was also convicted of one count of conspiracy to commit first degree murder and unlawful possession of a firearm.

Robinson and Rowland argue that (1) the trial court violated their right to a public trial when it failed to memorialize numerous off-record sidebars and (2) sufficient evidence does not support their convictions for first degree attempted robbery. In addition, Robinson argues that (3) his attempted robbery conviction violates double jeopardy and should be merged into his first degree felony murder conviction and (4) the trial court erred when it sentenced him as a persistent offender because the trial court improperly considered a facially invalid plea to a prior most serious offense. And Rowland argues that (5) he received ineffective assistance of counsel when his attorney withdrew a request for an "unarmed accomplice"[1] affirmative defense instruction to first degree murder. Rowland and Robinson also (6) submit extensive statements of additional grounds (SAGs).[2]

We hold that (1) the trial court did not violate Robinson's and Rowland's public trial right, (2) sufficient evidence supports their attempted robbery convictions, (3) Robinson's attempted robbery conviction violates double jeopardy, (4) the trial court did not err when it sentenced Robinson as a persistent offender, and (5) Rowland's counsel provided effective assistance. In

---

[1] Under RCW 9A.32.030(1)(c), it is a defense to first degree felony murder if a participant "(i) [d]id not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and (ii) [w]as not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and (iii) [h]ad no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and (iv) [h]ad no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] RAP 10.10.

addition, we (6) reject Robinson's and Rowland's SAG claims as lacking merit, relying on matters outside the record, or too vague to address. We remand for the trial court to vacate Robinson's attempted robbery conviction but affirm all other convictions.

FACTS

I. BACKGROUND FACTS

On November 12, 2012, a home intruder entered an apartment occupied by Juan Hidalgo Mendoza and Jaime Diaz-Solis. The intruder shot Diaz-Solis, who died at the scene.

After an investigation, law enforcement believed that William Alvarez Calo had planned to kill and steal from two men who acted as drug wholesalers for a Mexican cartel: Hidalgo Mendoza and Alberto Mendoza "Yeto" Ortega.[3] Law enforcement believed that Calo directed co-defendants Robinson and Rowland, along with Robert Smith, Jiffary Mendez, Ray Turner, and Fidel "Vinnie" Gaytan-Gutierrez, to break into Hidalgo Mendoza's apartment and steal drugs and money. Law enforcement believed that Robinson had shot Diaz-Solis, Hidalgo Mendoza's roommate, while breaking into the apartment.

The State charged Robinson and Rowland with one count each of first degree felony murder of Diaz-Solis (RCW 9A.32.030), conspiracy to commit first degree murder (RCW 9A.28.040), first degree burglary (RCW 9A.52.020), and attempted first degree robbery from Diaz-Solis (RCW 9A.28.020; RCW 9A.56.190, .200). In addition, the State charged Robinson with unlawful possession of a firearm (former RCW 9.41.010(7) (2009); former RCW 9.41.040 (2011).

---

[3] Alberto Mendoza Ortega was referred to throughout trial as "Yeto." For clarity, we also refer to him as Yeto.

3

## II. ROWLAND'S ARREST AND TRANSPORT

Rowland was arrested in Oregon in October 2014 by local Oregon police and United States Marshals. Rowland signed a form stating that he "freely and voluntarily agree[s] to accompany any officer . . . to the State of Washington" and waived Oregon's statutory extradition procedure. Clerk's Papers (CP) at 206.

On October 21, 2014, two police officers, Lakewood Police Department Detectives Jason Catlett and Les Bunton took custody of Rowland and brought him across state lines to Washington. During the drive, the detectives interviewed Rowland about his involvement in the events on November 12, and Rowland criticized Calo's plan, saying, "[W]e should have gone up in there and yelled some shit like, police. Get down. And then the shit would have been so much easier." 17 Verbatim Report of Proceedings (VRP) at 2246.

## III. PRETRIAL MOTIONS

Rowland filed a motion to suppress and motion to dismiss. Rowland's motion to suppress argued that he did not waive his *Miranda*[4] rights before the detectives interviewed him during the drive from Oregon to Washington. After a hearing, the trial court denied this motion.

In his motion to dismiss, Rowland argued that the State violated his due process rights when law enforcement allegedly failed to comply with Oregon's extradition statutes providing procedures for removal of arrestees to other states. The trial court denied the dismissal motion on the basis that even if Rowland's removal from Oregon did not follow statutory procedures,

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

violation of Oregon's extradition procedures is not a due process violation. Consequently, the trial court concluded that dismissal was not an appropriate remedy.

## IV. TRIAL

Robinson's and Rowland's cases proceeded to a joint trial. The first trial resulted in a mistrial as to all counts because the jury could not unanimously agree on verdicts. Before the second trial, the parties agreed to adopt the pretrial rulings from the first trial. The second trial began in June 2016.

### A. STATE'S TESTIMONY AND EVIDENCE

The State presented testimony from 22 witnesses. Numerous witnesses testified regarding personal knowledge about the individuals involved in Calo's plan and their actions on November 12, 2012.[5] In addition, numerous first responders and law enforcement officials testified about the emergency and investigative response immediately after the shooting.[6] And several expert witnesses testified.[7]

The State's witnesses testified consistent with the following.

---

[5] These witnesses included Jiffary Mendez and Robert Smith, who participated in Calo's plan; Hidalgo Mendoza, Diaz-Solis's roommate; Yeto; Calo's associate Jacinto Uscanga Fernandez; Calo's roommate Jimmy Reyes; and Diaz-Solis's neighbors, Malieafenoa Faamuli and Angela Fiveash.

[6] Law enforcement and emergency responder witnesses included City of Lakewood Police Officers Michael Johnson, Ryan Moody, Jonathan Waller, Keith Czuleger, Bryan Johnson, and Noah Dier; Detective Bunton; Detective Catlett; and West Pierce Fire and Rescue Emergency Medical Services Captain David R. McGrady, who provided emergency response.

[7] Expert witnesses included Pierce County Associate Medical Examiner John Matthew Lacy, who performed Diaz-Solis's autopsy; Verizon Wireless Senior Analyst Joseph Ninete, who testified about cell phone records and cell-site location; and Washington State Patrol Crime Laboratory Forensic Scientist Brenda Walsh, who testified about firearms.

1.      PARTICIPANTS' ACTIVITIES BEFORE, DURING, AND IMMEDIATELY AFTER THE SHOOTING

Hidalgo Mendoza was a major wholesaler for a Mexican drug cartel and provided illegal drugs to several drug dealers in Tacoma, including his roommate Diaz-Solis and his cousin Yeto. In turn, Yeto had numerous people helping him to deal drugs, including Calo. And Calo had several men working for him.

When Calo started stealing money from Yeto, Yeto fired him. Calo knew that Yeto had two properties: a home in Tacoma and a "stash house" in Lakewood where he kept drugs and money and where Yeto's cousin Hidalgo Mendoza lived. Calo was angry about being fired, and he started telling the people who worked for him that he wanted to kill Yeto and steal his drugs and money.

On November 12, 2012, Calo met at a garage attached to his home with Robinson as well as Mendez, Turner, Gaytan-Gutierrez, and Smith, to discuss a plan to steal Yeto's drugs and money from his two properties and kill Yeto. The plan was for the group to go to Yeto's Tacoma home, rob him, tie him up, and leave him at the house so that Calo and another man could enter and kill Yeto. After leaving Yeto's home, the group was supposed to go to Yeto's Lakewood stash house and rob the property and tie up anybody who was inside. After discussing the plan with the group, Calo passed out firearms and gave one to Robinson.

As the group was leaving to execute the plan, Rowland arrived in his car. Rowland knew from previous discussions that the group planned to commit a robbery, and Calo offered Rowland money to participate. Rowland, Robinson, Mendez, Turner, Gaytan-Gutierrez, and Smith[8] divided

---

[8] These six men will be referred to collectively as the "participants."

into two cars. Rowland agreed to drive Mendez and Gaytan-Gutierrez while Robinson drove Turner and Smith.

As the participants headed towards Yeto's Tacoma home, Calo called to change the plan and sent the participants to the stash house to steal from that location first. Calo told them that "there should be no one home, but if someone is there then somebody would tie them up." 15 VRP at 2020.

The participants drove to Yeto's stash house. On the way, Mendez and Gaytan-Gutierrez explained the plan to Rowland, telling him that they were going to the stash house to take the drugs and tie up anyone in the house for Calo to kill.

When the participants arrived at the apartment where the stash house was located, they got out of their cars and put on gloves and masks. They also grabbed duct tape and zip ties from Robinson's car trunk. They crept along the shadows of the fence line to stay out of sight until they arrived at the bushes outside the stash house, where they waited for approximately 10 minutes.

At the back of the stash house, Rowland was standing apart from the group serving as a lookout. Gaytan-Gutierrez and Robinson were openly holding their guns, and Mendez was holding his gun but then placed it in his waistband.

Gaytan-Gutierrez walked to the back porch, discovered that the sliding glass door was unlocked, pushed the door open two inches, and then returned to the group and told them they could just walk in. Then Robinson approached the sliding glass door, followed by the other participants, with Rowland at the back of the line. Robinson, Gaytan-Gutierrez, and Mendez entered the apartment, but Rowland did not.

As Robinson entered, he drew his gun. He saw Diaz-Solis inside and shot him. The group fled. Rowland ran from the building back to his car, and Mendez and Gaytan-Gutierrez got into Rowland's vehicle. Robinson also ran back to his car but realized he lost his keys. He asked to ride in Rowland's car, but there was no room, and Rowland drove away.

Mendez called Robinson several times after fleeing the scene to offer Robinson a ride away from the area near the shooting. Mendez identified in phone records the times that he called Robinson after the shooting to offer a ride. When Mendez eventually spoke with Robinson, Robinson said he had a ride from one of Calo's employees, Uscanga Fernandez. Cell phone records confirmed that Uscanga Fernandez and Robinson exchanged numerous phone calls in the area of the shooting on the night of the shooting. Uscanga Fernandez also testified that upon Calo's request, he picked up two black men near the scene of the shooting on the night of the shooting, including a man he believed was named "Trig," which others testified was a nickname for Robinson. 10 VRP at 1259.

The day after the shooting, Robinson arranged for his car to be towed away from where it was parked near the stash house.

2.   LAW ENFORCEMENT INVESTIGATION

911 received a call reporting the shooting at 9:46 PM on November 12. When officers arrived to the scene within minutes of the 911 call, they provided emergency care for Diaz-Solis but pronounced him dead at the scene. Law enforcement secured the scene and investigated by searching the area, taking photographs, and attempting to track the scent of potential intruders using a K-9 officer.

Police found $38,000 cash that had been in the stash house and that Hidalgo Mendoza moved to his car before law enforcement arrived at the scene. Months later, the police found drugs in the apartment's walls, including 14 kilograms of heroin and 2 kilograms of methamphetamine.

Forensic pathologist Dr. Lacy at the Pierce County Medical Examiner's Office performed Diaz-Solis's autopsy and determined that Diaz-Solis's death was a homicide by gunshot wound.

3.    OTHER EVIDENCE

Photographs taken the night of the shooting depicted the exterior and interior of the apartment complex where Diaz-Solis was shot, including pictures of the sliding glass door at the back of the apartment. Law enforcement obtained Robinson's cell phone records, which supported that Robinson's cell phone was in Lakewood at the time of the murder and reflected multiple calls to other participants before and after the shooting.

B. ROBINSON'S TESTIMONY

Robinson testified on his own behalf, and his wife Lea Hayes also testified. Robinson testified that he was not involved and did not participate in Calo's plan to steal Yeto's property and then kill him. Calo asked Robinson to participate, but he refused. Robinson had loaned his car to Smith on the day of the shooting, and Smith lost the car keys.

Robinson acknowledged that he was in the area near the shooting on the night it occurred, but he was only there to look for his car. His phone calls to participants were to determine where his car was. Robinson asked Hayes to come pick him up from the area and to help him search for his car keys. Hayes testified and confirmed Robinson's alibi.

9

C. ROWLAND'S DIRECT TESTIMONY

Rowland testified on his own behalf. On the night that Diaz-Solis was shot, Rowland was at Calo's garage for a few minutes but was not involved in "any type of planning." 16 VRP at 2153. While at the garage, Rowland saw Mendez, Smith, Gaytan-Gutierrez, and Uscanga Fernandez.

Mendez asked Rowland to give him and Gaytan-Gutierrez a ride, and Rowland agreed. After the three got in the car, Mendez told Rowland to drive to Lakewood. Rowland did not know where they were going specifically or why they were driving to Lakewood, and Mendez gave Rowland directions on where to drive and park. Then another car, with people Rowland did not recognize, parked next to him. Mendez and Gaytan-Gutierrez got out of the car and started walking with the men from the other car. Rowland decided to follow them, not knowing what they were doing or where they were going.

The group walked toward an apartment building, approaching it from the back. Rowland thought they were going to a friend's house, but then he noticed some of the men ducking down, so he stopped and backed away from the group because he became suspicious. As the group formed together behind the house, with Rowland standing separately, he believed he saw a gun in a participant's hand.

The men lined up to enter the apartment and began to go up the back porch steps, but Rowland did not line up with them. Then Rowland heard a gunshot. Rowland fled from the scene and met Mendez and Gaytan-Gutierrez at his car. Rowland drove them away from the scene. Rowland told Mendez and Gaytan-Gutierrez that he was angry because he had no idea what was

10

going on, and both men said they thought Rowland knew the plan. Mendez wanted Rowland to drive him back to the scene, but Rowland refused.

### D. ROWLAND'S IMPEACHMENT AND STATE'S REBUTTAL

Before cross-examination, the State made a motion to question Rowland about his statement to detectives during the drive from Oregon to Washington that "[w]e should have gone up in there and yelled some shit like quote, Police. Get down, and then the shit would have been so much easier." 16 VRP at 2188. After argument by the parties, the trial court ruled that the statements were admissible because they were relevant to whether Rowland had knowledge of the plan to rob the stash house.

During cross-examination, Rowland admitted that he made the statement to Detectives Catlett and Bunton, but he insisted he was joking. During rebuttal, Catlett testified that Rowland was not joking when he made the statement.

### E. SIDEBARS

Throughout trial, the court held numerous sidebars off the record. Six sidebars were memorialized on the record the day after they occurred. Three sidebars were not memorialized in the record.[9]

### F. STATE'S CLOSING ARGUMENT

The State argued in closing that Robinson and Rowland participated in the plan to steal from the stash house that was occupied by Diaz-Solis, and in the process, Robinson shot and killed

---

[9] For the sake of brevity, relevant facts regarding each of the sidebars are contained as needed in the analysis.

11

Diaz-Solis. The State argued that the defendants could be convicted as accomplices for any of the crimes except Robinson's unlawful possession of a firearm charge.

The State asserted that cell phone records supported that Robinson was present at the crime scene at the time the shooting took place. In addition, the State asserted that Rowland knew another participant was armed with a gun during the break-in, that he saw multiple guns in the garage before they left for the stash house, and that he acted as a lookout to aid the commission of the robbery and burglary. The prosecutor also summarized Rowland's testimony that he was present during the crimes but did not have knowledge that the participants intended to commit crimes. The State asserted that contrary to Rowland's claims, Rowland knew that the participants intended to commit an armed burglary and robbery.

G. JURY INSTRUCTIONS AND WITHDRAWAL OF ROWLAND'S AFFIRMATIVE DEFENSE INSTRUCTION

Rowland's counsel requested an instruction on an "unarmed accomplice" affirmative defense to first degree murder, but at the conclusion of trial, Rowland's defense counsel withdrew his request for this instruction. Counsel stated that he "spent a lot of time looking at this and deciding whether or not [he] could use it or if it was appropriate in this case, and [he] made the decision to withdraw it." 18 VRP at 2453. The instruction would have provided that it is a defense to first degree felony murder if the jury finds by a preponderance of the evidence that the defendant

(1) [d]id not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
(2) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and
(3) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and
(4) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

CP at 231. The trial court did not give the instruction.

The trial court instructed the jury regarding each of the charges and accomplice liability.

V. CONVICTIONS AND SENTENCING

The jury convicted Robinson on all counts. The jury convicted Rowland of all counts except conspiracy to commit first degree murder.

A. ROWLAND'S SENTENCING

The sentencing court ordered Rowland to a low-end standard range sentence of 240 months for the murder, plus a 60-month firearm enhancement for a total of 300 months. Rowland was sentenced for only the first degree murder because the sentencing court concluded that the burglary and robbery convictions should merge into the murder conviction and vacated the attempted robbery and burglary convictions.

In rendering its decision to merge the attempted robbery and burglary convictions with the murder, the sentencing court stated that the jury was not asked which crime was the predicate offense for felony murder and "either or both could be the predicates and both merge." 20 VRP at 2620. The sentencing court declined to apply the burglary antimerger statute to prevent merger of the murder and burglary convictions.

B. ROBINSON'S SENTENCING

Robinson had two prior most serious offense convictions, so his convictions for murder, attempted robbery, burglary, and conspiracy each independently provided a third serious offense and qualified him as a persistent offender.[10] As a persistent offender, Robinson was sentenced to

---

[10] Subject to some conditions, a persistent offender is an offender who is convicted of a most serious offense and who previously was convicted as an offender of most serious offenses on at least two separate occasions. Former RCW 9.94A.030(37) (2011).

life without the possibility of parole on counts I (felony murder), II (conspiracy), III (burglary), and IV (attempted robbery). He was sentenced to 116 months on count V (unlawful possession of a firearm).

At sentencing, Robinson argued that a prior guilty plea to a most serious offense from 1998 was invalid and should not be considered by the sentencing court when sentencing Robinson. He argued that it was not facially valid because the paragraph which notified him that he was pleading to a strike offense was stricken by his counsel at the time he pleaded guilty, and his counsel was ineffective for failing to inform him that he was pleading guilty to a most serious offense. The State argued that because the judgment and sentence was facially valid, the sentencing court could not overlook the prior guilty plea. And the State argued that if Robinson wanted to challenge the prior plea, he needed to do so through other appropriate appellate processes, including a personal restraint petition for the 1998 conviction. The sentencing court agreed with the State and held that if Robinson received ineffective assistance regarding his 1998 guilty plea, the proper remedy was to appeal the prior conviction.

Before ordering Robinson's sentence, the sentencing court briefly addressed whether the burglary and robbery should be merged into the murder conviction. The State argued that because Robinson was to be sentenced as a persistent offender, "there is no reason to merge" because his sentence was going to be life without the possibility of parole regardless of whether the burglary and robbery counts merged. 20 VRP at 2600. Defense counsel agreed with the State that "[i]f Mr. Robinson is a third strike offender then there's no reason to argue any of the other issues that I've raised" regarding merger. 20 VRP at 2601. The sentencing court found, consistent with the State's argument and defense counsel's concession, that because Robinson was being sentenced as a

14

persistent offender to life without the possibility of parole, there was no need to consider merging the burglary and attempted robbery convictions with the murder conviction.

Both defendants filed timely appeals.

ANALYSIS

I. RIGHT TO A PUBLIC TRIAL

Robinson and Rowland[11] argue that the trial court violated their right to a public trial when the trial court failed to hold the three sidebar conferences on the record. The State argues that the trial court conducted proper sidebar conferences and did not violate Rowland's and Robinson's right to a public trial. We agree with the State.

A. PRINCIPLES OF LAW

Whether a trial court has violated the defendant's public trial right is a question of law reviewed de novo. *State v. Smith*, 181 Wn.2d 508, 513, 334 P.3d 1049 (2014). The right to a public trial is guaranteed by article I, sections 10 and 22 of the Washington State Constitution and Amendment VI of the United States Constitution. *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015), *cert. denied*, 136 S. Ct. 1524 (2016). The public trial right facilitates fair and impartial trials by reminding those involved about the importance of their roles and by holding them accountable for misconduct. *Love*, 183 Wn.2d at 604-05.

However, "[t]he right to public trial is not absolute." *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). "[W]hile openness is a hallmark of our judicial process, there are other rights and considerations that must sometimes be served by limiting public access to a trial." *Wise*, 176

---

[11] Although Rowland does not explicitly raise this argument in his brief, Rowland adopts Robinson's arguments "[t]o the extent applicable." Br. of Appellant (Rowland) at 15.

Wn.2d at 9. To balance the public trial right and other competing rights and interests, the court applies a three-step analysis: (1) whether the public trial right attaches to the proceeding at issue, (2) whether the courtroom was closed, and (3) whether the closure was justified. *Love*, 183 Wn.2d at 605. "The appellant carries the burden on the first two steps; the proponent of the closure carries the third." *Love*, 183 Wn.2d at 605.

Under the first step, the public trial right does not attach to sidebars that are limited in content to traditional subject areas, held only to avoid disrupting the flow of trial, and conducted on the record or promptly memorialized in the record. *Smith*, 181 Wn.2d at 516 n.10.

Second, if the defendant can prove that the sidebars implicated his public trial right, the court must determine whether they amounted to a courtroom closure under the second prong. *Smith*, 181 Wn.2d at 520. Closure occurs when "'the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave'" or when "a portion of a trial is held someplace 'inaccessible' to spectators, usually in chambers." *Love*, 183 Wn.2d at 606 (quoting *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011)). Courts apply the "experience and logic test to determine whether a closure occurred in the absence of an express closure on the record." *Smith*, 181 Wn.2d at 520.

Third, the trial court must apply the weighing test described in *State v. Bone-Club*, 128 Wn.2d 254, 258, 906 P.2d 325 (1995), before the proceeding may be closed to the public. *Smith*, 181 Wn.2d at 520. The record must show that the trial court effectively weighed the defendant's public trial right against other compelling interests. *Smith*, 181 Wn.2d at 520.

B. OFF-RECORD SIDEBARS WERE PROPER

Robinson and Rowland appear to argue that their public trial right was violated by three instances during which the trial court conducted sidebars off the record that were not later memorialized on the record.[12] The parties agree that under the first prong of the public trial right analysis, the public trial right attaches to the three sidebars that were not memorialized. *See Smith*, 181 Wn.2d at 513, 516 n.10. In addition, it is undisputed that the trial court did not engage in a *Bone-Club* analysis under the third prong. *See Smith*, 181 Wn.2d at 520.

Thus, whether Robinson's and Rowland's public trial right was violated hinges on the second prong—whether the sidebars amounted to a "courtroom closure." *Love*, 183 Wn.2d at 606; *Smith*, 181 Wn.2d at 520. The State is correct that because the three off-record and unmemorialized sidebars did not amount to courtroom closures, they did not violate Robinson's and Rowland's public trial right.

1.    VOIR DIRE SIDEBARS

The first two sidebars that Robinson and Rowland challenge occurred close together near the end of voir dire. The record supports that the sidebars dealt with the logistics of allowing counsel to make final jury selection decisions and exercise peremptory challenges. Because no courtroom closure occurred, the sidebars were proper.

On the record, the trial court, defense counsel, and the State discussed the peremptory challenge process and also discussed which jurors should be excused for cause based on

---

[12] Robinson identified a fourth instance that he alleges was a sidebar that was not memorialized. However, as the State asserts, this citation refers to a sidebar held in open court on the record after the jury was excused. As such, the hearing did not implicate the defendants' public trial right. *See Smith*, 181 Wn.2d at 519, 516 n.10.

questionnaire answers. After each attorney asked questions, the court informed the venire on the record that it was "going to talk to the lawyers and then we'll see where we're at." 3 VRP at 384. The court stated that the jury could take a break and asked to see the counsel at sidebar.

The record reflects a pause in the proceedings during which the first sidebar at issue occurred, and then the trial court stated,

> Okay. Folks, what I'm going to ask you to do is, you can talk to each other but I'm going to ask you to be seated so *the lawyers can look at your numbers and see who's who. We're going to go through the final phase of jury selection, which involves really passing paper.* We don't call you up and,—we'll tell you later who's seated where.
> The military term is "at ease," so you can talk to each other, but don't talk about the case. *And it will be probably just a few more minutes as we go through this*.

3 VRP at 384-85 (emphasis added).

Next, the trial court addressed the jury regarding some historical information about Washington courts and stated, "I think I need to talk to the lawyers, and so you all can talk . . . and I think we will tell you who the jury is in just a few minutes." 3 VRP at 395. After a pause in the proceeding during which the second sidebar at issue occurred, the trial court called the numbers of specific jurors who would be on the panel and excused the remaining venire members. The peremptory challenge sheet was filed with the trial court.

This case is quite similar to *Love*, another case where part of the peremptory challenge process was arranged in a sidebar. 183 Wn.2d at 602-07. Just as the sidebar for peremptory challenges at the end of voir dire was proper in *Love*, the voir dire sidebars in Robinson's and Rowland's cases were proper. As in *Love*, the record supports that the two sidebars provided an opportunity for counsel to review the list of potential jurors and exercise peremptory challenges in

a manner that was open to the public. As in *Love*, the public and the venire were both allowed to be in the courtroom and freely enter and leave. And as in *Love*, the peremptory challenge sheet completed during the sidebars at issue was filed in the trial court record. Because the public had the opportunity to scrutinize jury selection from start to finish, Robinson and Rowland were afforded the safeguards of the public trial right. *Love*, 183 Wn.2d at 607. Under *Love*, the voir dire sidebars did not amount to a courtroom closure, and thus their public trial right was not violated when the sidebars were not memorialized. 183 Wn.2d at 606-07.

2.    EVIDENTIARY SIDEBAR

The third challenged sidebar occurred during the State's direct examination of Detective Catlett when the State sought to admit a document containing the detective's prepared summary of certain cell phone records. Defense counsel requested a sidebar, and the sidebar occurred off the record. Immediately following the sidebar, the trial court asked, "And is there any objection to [Exhibit] 341 or do you want to voir dire the witness?" 8 VRP at 981. Defense counsel stated her objection on the record, and the trial court admitted the exhibit over her objection.

Robinson and Rowland appear to rely on *State v. Whitlock*, 195 Wn. App. 745, 754-55, 381 P.3d 1250 (2016), *aff'd*, 188 Wn.2d 511, 396 P.3d 310 (2017), to support that the evidentiary sidebar violated their public trial right. In *Whitlock*, Division Three of this court held that an *in-chambers* evidentiary conference held during a bench trial and not memorialized on the record violated the defendant's public trial rights. 195 Wn. App. at 755. Relevant here, the *Whitlock* court held that the evidentiary conference amounted to a court closure under the second prong because the proceeding occurred in chambers and the public was excluded. 195 Wn. App. at 754-55.

As the State asserts, *Whitlock* is distinguishable. *Whitlock*'s in-chambers evidentiary conference that was closed to the public did not happen here. Because Robinson and Rowland have not carried their burden to show that the sidebar amounted to a closure and because the brief sidebar was conducted in front of the jury and public, their public trial claim fails. *Love*, 183 Wn.2d at 605-07.

### C. SIX MEMORIALIZED SIDEBARS

Robinson and Rowland also appear to challenge numerous sidebars that were memorialized the day after they occurred. Because Robinson and Rowland have failed to support that these sidebars were inadequately memorialized, their claim fails. Under *Smith*, sidebars that are "promptly memorialized in the record" do not implicate the public trial right. 181 Wn.2d at 516 n.10. Robinson and Rowland provide no record or legal citations to support that sidebars memorialized the day after they occur violate the public trial right, and they also do not provide argument to support that the trial court was closed during the cited sidebars. As such, they have failed to carry their burden. *Love*, 183 Wn.2d at 605-07.

In sum, Robinson and Rowland have failed to carry their burden of proof to demonstrate that their public trial rights were violated and their claim fails.

### II. SUFFICIENCY OF THE EVIDENCE

Robinson and Rowland argue that the State did not provide sufficient evidence to support their attempted first degree robbery convictions. Specifically, they argue that Robinson and Rowland did not believe the apartment they entered was occupied, so the State failed to prove that they intended to take property from or in the presence of another person. The State argues that sufficient evidence supports Robinson's and Rowland's convictions for attempted robbery. We

agree with the State that sufficient evidence supports both Robinson's and Rowland's attempted robbery convictions.

## A. PRINCIPLES OF LAW

We review sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014). When reviewing sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the crime's essential elements beyond a reasonable doubt. *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). We assume all of the State's evidence and any reasonable inferences from it are true, and all reasonable inferences from the evidence must be drawn in the State's favor and interpreted most strongly against the defendant. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the jury to resolve issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. *State v. Rodriquez*, 187 Wn. App. 922, 930, 352 P.3d 200 (2015).

To convict a defendant of attempted first degree robbery, the jury needed to find that the defendant intended to commit robbery and took a substantial step toward carrying out that intent. RCW 9A.28.020(1); *State v. Kier*, 164 Wn.2d 798, 807, 194 P.3d 212 (2008). A substantial step for purposes of the criminal attempt statute is defined as conduct that is "strongly corroborative of the actor's criminal purpose." *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 539, 167 P.3d 1106 (2007).

A person commits robbery when he "unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate

force, violence, or fear of injury." RCW 9A.56.190. In addition, the victim "must have an ownership, representative, or possessory interest in the property" taken. *State v. Tvedt*, 153 Wn.2d 705, 714, 107 P.3d 728 (2005).

## B. ROBINSON'S ATTEMPTED ROBBERY

Here, sufficient evidence supported that Robinson (1) intended to commit robbery and (2) took a substantial step toward carrying out that intent.

Contrary to Robinson's claim that he did not believe the stash house would contain any occupants, the State's evidence supports that Robinson knew that Yeto's stash house could be occupied and that he intended to rob any occupants inside. When Calo called the group and told them to drive to the stash house first, he said that "there should be no one home, but if someone is there then somebody would tie them up." 15 VRP at 2020. Given this, it is a reasonable inference that Robinson was aware that someone might be at the stash house and that he intended to steal from them. Moreover, the State presented testimony that when Robinson entered the stash house, he pulled out a gun, cocked it, and then shot the gun at the occupant inside, Diaz-Solis. From this action, it is a reasonable inference that Robinson carried a weapon to the stash house because he intended to use or threaten to use the weapon against individuals inside the apartment to take their property. Sufficient evidence established that Robinson intended to commit a robbery.

In addition, Robinson took numerous substantial steps toward carrying out his intent to commit robbery. After meeting to plan the robbery, Robinson armed himself with a gun and drove himself and two other people to the stash house where the robbery was supposed to occur. Robinson got out of his car and put on gloves and a mask from his trunk. He crept along the shadows of the fence line to stay out of sight until he arrived at the bushes outside the stash house.

22

He then approached the back door, brandished his weapon, entered the apartment, and then shot Diaz-Solis. These actions strongly corroborate Robinson's criminal purpose.

Accepting as true the State's facts and taking all reasonable inferences in favor of the State, a reasonable jury could easily conclude that Robinson committed attempted robbery. *See Sweany*, 174 Wn.2d at 914.

### C. ROWLAND'S ACCOMPLICE LIABILITY FOR ATTEMPTED ROBBERY

Sufficient evidence also supports Rowland's accomplice liability for attempted robbery.[13]

To convict a defendant of first degree attempted robbery as an accomplice, the State must prove beyond a reasonable doubt that the defendant knowingly promoted or facilitated another's attempted first degree robbery. *State v. Clark*, 190 Wn. App. 736, 762, 361 P.3d 168 (2015), *review denied*, 186 Wn.2d 1009 (2016). A person has actual knowledge when "he or she has information which would lead a reasonable person in the same situation to believe" he was promoting or facilitating the crime. RCW 9A.08.010(1)(b)(ii). "While the State must prove actual knowledge, it may do so through circumstantial evidence." *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015).[14]

The State's testimony supports that Rowland knowingly promoted or facilitated another's attempted first degree robbery. Rowland arrived at Calo's garage so that he could drive several other people to Yeto's properties. Rowland knew from previous discussions that the group planned

---

[13] It appears that the State argued at trial that Rowland was as an accomplice to attempted robbery.

[14] As discussed in Rowland's SAG issues below, a defendant may be properly convicted as an accomplice even when the "to convict" instruction does not define accomplice liability as long as the jury is properly instructed elsewhere on accomplice liability. *State v. Teal*, 152 Wn.2d 333, 339, 96 P.3d 974 (2004).

23

to commit a robbery, and Calo offered Rowland money to participate. Rowland agreed to drive Mendez and Gaytan-Gutierrez to Yeto's property and on the way, Mendez and Gaytan-Gutierrez explained the plan to Rowland, telling him that they were going to the stash house to take the drugs and tie up anyone in the house for Calo to kill. Rowland walked with the rest of the group to the back of the stash house, and he served as a lookout. Rowland knew that at least one man in the group had a gun because he saw light reflecting off the gun outside the stash house. After Robinson shot Diaz-Solis, Rowland fled with the group and drove the car, thus helping Mendez and Smith to flee the scene. Taken together in the light most favorable to the State, this evidence supports that Rowland had information that would lead a similarly situated, reasonable person to believe he was promoting or facilitating other participants' first degree robbery, and thus the evidence is sufficient to support Rowland's attempted robbery as an accomplice.

## III. DOUBLE JEOPARDY

Robinson argues that his convictions for attempted robbery and felony murder, with attempted robbery as the predicate offense, violate double jeopardy.[15] The State argues that it "conceded that the first degree attempted robbery merges into the felony murder," and the State appears to maintain this concession on appeal. Corrected Br. of Resp't at 26. But the State argues that the burglary antimerger statute may apply to prevent merger of the attempted robbery conviction with the burglary conviction, such that the attempted robbery may be considered to

---

[15] This double jeopardy argument is also mentioned in Robinson's and Rowland's SAGs.

Because the trial court properly merged Rowland's attempted robbery and burglary convictions with his murder conviction, double jeopardy is not at issue in Rowland's case.

24

calculate the burglary's offender score even if the attempted robbery merges with the murder conviction.

We accept the State's concession that the attempted robbery merges into the first degree murder, and we agree with the State that the robbery conviction may remain on Robinson's judgment and sentence to the extent that it affects Robinson's burglary offender score. We remand for the trial court to vacate Robinson's attempted robbery conviction and resentence him appropriately.

## A. PRINCIPLES OF LAW

We review double jeopardy claims de novo. *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006). The double jeopardy clauses of the United States Constitution and Washington Constitution prohibit multiple punishments for the same offense. *State v. Adel*, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004). When a conviction violates double jeopardy, it must be vacated. *State v. Womac*, 160 Wn.2d 643, 658, 160 P.3d 40 (2007); *State v. Weber*, 159 Wn.2d 252, 265-66, 149 P.3d 646 (2006).

The merger doctrine is a rule of statutory construction courts use to determine whether the legislature intended to authorize multiple punishments for a single act. *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983). Under the doctrine, when a particular degree of crime requires proof of another crime, "we presume the legislature intended to punish both offenses through a greater sentence for the greater crime." *State v. Freeman*, 153 Wn.2d 765, 773, 108 P.3d 753 (2005); *see State v. Johnson*, 92 Wn.2d 671, 680, 600 P.2d 1249 (1979).

Multiple punishments for crimes that might otherwise appear to merge will not violate the prohibition on double jeopardy if the legislature expresses its intent to punish each crime

25

separately. *State v. Elmore*, 154 Wn. App. 885, 899-900, 228 P.3d 760 (2010). RCW 9A.52.050, known as the "burglary antimerger statute," provides that a sentencing court may punish a defendant separately for all crimes he or she commits "in the commission of a burglary." *Elmore*, 154 Wn. App. at 900. Thus, double jeopardy is not violated when a defendant is convicted of both burglary and felony murder with burglary as the predicate offense. *Elmore*, 154 Wn. App. at 899-901. In addition, if the burglary antimerger statute applies, the offender score may be increased by calculating separately the burglary and crimes carried out in the commission of the burglary. *See State v. Lessley*, 118 Wn.2d 773, 779-82, 827 P.2d 996 (1992).

## B. STATE CONCESSION

The trial court entered convictions and life sentences for both attempted robbery and felony murder with attempted robbery as a predicate offense. The State apparently concedes that the attempted robbery conviction should have merged into the felony murder conviction. Corrected Br. of Resp't at 26-27 ("Here, while the State conceded that the first degree attempted robbery merges into the felony murder, RP 2618, . . . the court properly included all counts in the scoring [of the burglary offender score].").

The record shows that the attempted robbery was an underlying felony for Robinson's felony murder conviction, which means that the felony murder required proof of each element of the crime of attempted robbery. *See Orange*, 152 Wn.2d at 818. Because the felony murder required proof of attempted robbery, the first degree robbery merges into felony murder. *See Freeman*, 153 Wn.2d at 772-73. Accordingly, we accept the State's concession that the robbery merges into felony murder and vacate Robinson's attempted robbery conviction and its associated firearm enhancement.

26

C. CALCULATION OF BURGLARY OFFENDER SCORE

The State argues that although the attempted robbery and felony murder convictions merge, the attempted robbery conviction should remain listed on the judgment and sentence. The State argues that under the burglary antimerger statute, other crimes committed in the course of the burglary, including the attempted robbery, do not merge for the purpose of calculating the burglary offender score and sentence. Robinson did not file a reply brief and thus did not respond to this argument. We hold that on remand, the sentencing judge has discretion to determine whether Robinson's attempted robbery conviction should remain on his judgment and sentence for the sole purpose of calculating his burglary offender score.

In *State v. Tili*, the defendant was convicted of second degree assault, first degree rape, and burglary. The State conceded that the defendant's second degree assault conviction merged into his first degree rape conviction but argued that the antimerger statute still applied to the extent that it increased the defendant's burglary offender score. 139 Wn.2d 107, 112, 125-26, 985 P.2d 365 (1999). Our Supreme Court agreed, holding that the assault conviction, which was a current offense conviction, may still be used to calculate the offender score for the burglary conviction under the burglary antimerger statute. *Tili*, 139 Wn.2d at 125-26.

Under *Tili*, the sentencing court in Robinson's case has authority to consider the attempted robbery conviction in calculating Robinson's burglary offender score. On remand, the sentencing judge may exercise its discretion to determine whether to apply the burglary antimerger statute and consider Robinson's attempted robbery conviction when calculating his burglary offender score. RCW 9A.52.050.

27

D.  NO HARMLESS ERROR

Despite its concession, the State also appears to argue that the error of not merging Robinson's attempted robbery and murder convictions was harmless because Robinson was convicted as a persistent offender, so his sentence of life without possibility of parole would not change even if his robbery conviction is vacated.  This argument fails.  When a conviction violates double jeopardy, it must be vacated and is not subject to harmless error analysis, even if the resulting sentence has no practical effect on the offender.  Because Robinson's attempted robbery conviction violates double jeopardy, the appropriate remedy is to remand for the trial court to vacate the attempted robbery conviction.

IV.  PRIOR MOST SERIOUS OFFENSE

Robinson argues that he should not have been sentenced as a persistent offender because his conviction for a prior most serious offense is facially invalid.  Specifically, he asserts that his guilty plea was facially invalid because he was affirmatively misinformed regarding a collateral consequence before entering the plea, and thus his conviction based on the erroneous guilty plea was also facially invalid.  The State asserts that Robinson's judgment and sentence is facially valid and thus Robinson was properly sentenced as a persistent offender.  We agree with the State and hold that Robinson's prior conviction is facially valid, so Robinson's challenge fails.

A.  PRINCIPLES OF LAW

A persistent offender is a defendant who has been convicted of a most serious offense and has two prior felonies that are also most serious offenses.  Former RCW 9.94A.030(37).  A persistent offender shall be sentenced to life in prison without the possibility of release.  RCW 9.94A.570.

28

"The State has the burden of proving prior convictions used to calculate an offender score, but it is not responsible for proving the underlying constitutional validity of those convictions." *State v. Thompson,* 143 Wn. App. 861, 866, 181 P.3d 858 (2008); *State v. Ammons*, 105 Wn.2d 175, 187, 713 P.2d 719, 718 P.2d 796 (1986). Accordingly, "the constitutional validity of the prior convictions is generally not subject to challenge in sentencing proceedings." *State v. Jones,* 110 Wn.2d 74, 77, 750 P.2d 620 (1988). If such challenges were permitted, sentencing proceedings for the current conviction "would become an appellate forum for prior convictions." *Thompson*, 143 Wn. App. at 866.

However, convictions shall not be considered when calculating a defendant's sentence where the *conviction* is invalid on its face. *Ammons*, 105 Wn.2d at 187-88. "Constitutionally invalid on its face means a conviction [that] without further elaboration evidences infirmities of a constitutional magnitude." *Ammons*, 105 Wn.2d at 188. "The defendant, and not the State, 'bears the burden of establishing the unconstitutionality of his or her prior convictions at such a proceeding.'" *Thompson*, 143 Wn. App. at 866 (quoting *In re Pers. Restraint of Williams*, 111 Wn.2d 353, 368, 759 P.2d 436 (1988)).

A legal error in a *guilty plea* does not necessarily render a conviction facially invalid. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 135, 267 P.3d 324 (2011). Rather, a conviction is facially invalid only when the judgment and sentence, in the context of the charging documents, verdicts, and plea statements, shows that the sentencing court exceeded its statutory authority in entering the judgment and sentence. *Coats*, 173 Wn.2d at 136, 140; *see Thompson*, 143 Wn. App. at 866. If the "trial court would have to go behind the verdict and sentence and judgment to make"

a determination on constitutional invalidity, the conviction is not facially invalid. *Ammons*, 105 Wn.2d at 189.

A guilty plea is constitutionally invalid when the defendant was not informed of the *direct* consequences of his plea. *State v. Ross*, 129 Wn.2d 279, 284, 916 P.2d 405 (1996). The fact that a defendant is pleading guilty to a "'most serious crime'" is *not* a direct consequence of a guilty plea about which a defendant must be informed before pleading guilty. *State v. Lewis*, 141 Wn. App. 367, 395, 166 P.3d 786 (2007). Moreover, affirmative misinformation about a collateral consequence of a guilty plea does not make a guilty plea involuntary, and thus unconstitutional, per se. *In re Pers. Restraint of Reise*, 146 Wn. App. 772, 787, 192 P.3d 949 (2008) (citing *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 298, 88 P.3d 390 (2004)). "[A]ffirmative misinformation about a collateral consequence may nevertheless create a manifest injustice if the defendant materially relied on that misinformation when deciding to plead guilty." *Reise*, 146 Wn. App. at 787.

## B. FACIAL VALIDITY

To support that his conviction was facially invalid, Robinson argues that the plea was facially invalid because it contained a crossed-out paragraph stating that his crime was a most serious offense and that if he had two prior most serious offense convictions, he would receive a sentence of life without the possibility of parole.[16] Former RCW 9.94A.030(32)(o) (2011).

---

[16] The crossed-out paragraph stated, "This offense is a <u>most serious offense</u> as defined by RCW 9.94A.030; and if I have at least two prior convictions for most serious offenses, whether in this State, in federal court, or elsewhere, the crime for which I am charged carries a mandatory sentence of life imprisonment without the possibility of parole. (If not applicable, this sentence should be stricken and initialed by the defendant and the Judge.)" CP at 873 (alteration in original).

Robinson acknowledges that under *Lewis*, a plea is not facially invalid when the defendant is not informed of the collateral consequence that he is pleading guilty to a most serious offense. 141 Wn. App. at 395-96. But Robinson argues that his counsel in the prior proceeding was deficient because he "affirmatively misrepresented" to Robinson regarding the "most serious" nature of the crime and this renders the plea with the crossed-out paragraph facially invalid. Br. of Appellant (Robinson) at 21. We hold that Robinson's authority is unpersuasive, and his conviction was facially valid under *Coats* and *Reise*. Consequently, Robinson's challenge to his prior conviction and the resulting persistent offender sentence fails.

1. ROBINSON'S AUTHORITY FAILS TO SUPPORT FACIAL INVALIDITY

Robinson cites no authority to support that being misinformed regarding a collateral consequence of a guilty plea renders the corresponding conviction facially invalid. And Robinson does not claim that he was misinformed regarding a *direct* consequence of his plea, which would support that the plea was facially invalid. *Ross*, 129 Wn.2d at 284.

Instead, Robinson cites only authority that an *ineffective assistance of counsel claim* may be based on evidence that counsel affirmatively misinformed the defendant regarding the collateral consequences of a guilty plea. *State v. Stowe*, 71 Wn. App. 182, 186, 858 P.2d 267 (1993); *State v. Ward*, 123 Wn.2d 488, 512, 869 P.2d 1062 (1994) (cited by Br. of Appellant (Robinson) at 20). The argument is that where the record reveals ineffective assistance of counsel in the plea process, the ensuing plea is facially invalid.

But to determine whether Robinson's counsel was ineffective in a prior proceeding, we would "have to go behind the verdict and sentence and judgment" to examine counsel's conduct in the context of the proceeding in which it occurred. *Ammons*, 105 Wn.2d at 189. An inquiry

31

into counsel's conduct in a prior proceeding is not appropriate when considering the facial validity of the judgment and sentence. *See Ammons*, 105 Wn.2d at 189.

2.    *COATS*

With the ineffective assistance claim off the table, the State correctly asserted at oral argument that Robinson's judgment and sentence was facially valid under *Coats*. Robinson claims that his judgment and sentence was facially invalid because his *guilty plea* contained language which, as stricken, may have erroneously indicated that he was not pleading guilty to a most serious offense. But this alleged error in his prior plea document does not itself render the *judgment and sentence* invalid because it does not show that the sentencing court exceeded its statutory authority in entering the judgment and sentence. *Coats*, 173 Wn.2d at 136, 140.

A judgment and sentence is facially invalid when in the context of the charging documents, verdicts, and plea statements, it shows that the sentencing court exceeded its statutory authority in entering the judgment and sentence. *Coats*, 173 Wn.2d at 136, 140. For example, convictions are facially invalid when the court enters a sentence that exceeds the statutory maximum authorized by law; when the judgment and sentence contains sentences for nonexistent crimes; when the court, without authority, grants or denies earned early release time; when the sentencing court improperly calculates the offender score; and when the sentencing court enters a conviction for a crime that was charged after the statute of limitations has expired. *Coats*, 173 Wn.2d at 135-36  (citing *In re Pers. Restraint of Tobin*, 165 Wn.2d 172, 176, 196 P.3d 670 (2008); *In re Pers. Restraint of Hinton*, 152 Wn.2d 853, 857, 100 P.3d 801 (2004); *In re Pers. Restraint of West*, 154 Wn.2d 204, 206-07, 110 P.3d 1122 (2005); *In re Pers. Restraint of LaChapelle*, 153 Wn.2d 1, 6, 100 P.3d 805 (2004); *In re Pers. Restraint of Stoudmire*, 141 Wn.2d 342, 353, 5 P.3d 1240 (2000)).

However, a plea agreement's facial invalidity does not itself render the judgment and sentence facially invalid because "'plea documents are relevant only where they may disclose invalidity in the judgment and sentence.'" *Coats*, 173 Wn.2d at 141 (quoting *In re Pers. Restraint of Hemenway*, 147 Wn.2d 529, 533, 55 P.3d 615 (2002)). Thus, if the plea document contains errors but the judgment and sentence does not exceed the court's authority, the judgment and sentence is facially valid and courts will not allow a collateral attack on a prior conviction. *Coats*, 173 Wn.2d at 136, 140-42.

Robinson has failed to assert or explain—and our record fails to demonstrate—that the sentencing court, in entering the judgment and sentence for his prior plea, exceeded its statutory authority and thus entered a facially invalid judgment and sentence. *See Coats*, 173 Wn.2d at 136, 140. Moreover, Robinson has failed to explain why alleged errors in the plea document demonstrate invalidity in the judgment and sentence. *See Coats*, 173 Wn.2d at 141. Because Robinson has failed to demonstrate that his prior judgment and sentence is facially invalid, his claim fails.

3.     *REISE*

Robinson's challenge to his conviction's facial validity also fails because he erroneously assumes that his guilty plea was invalid based on the language in the guilty plea alone. This argument fails under *Reise*.

Under *Reise*, affirmative misinformation regarding a collateral consequence is not alone sufficient to render a guilty plea invalid. 146 Wn. App. at 787. To determine whether misinformation regarding a collateral consequence undermines a prior plea, one would need *more evidence* beyond the plea and judgment and sentence to determine whether the defendant

"materially relied" on affirmative misinformation about a collateral consequence. *Reise*, 146 Wn. App. at 787.

Under this analysis, the court "would have to go behind the verdict and sentence and judgment to make" a determination on constitutional invalidity, which means that it goes beyond the scope of the court's inquiry into facial validity of a conviction. *Ammons*, 105 Wn.2d at 189. As such, even if Robinson is correct that he was affirmatively misinformed regarding the consequences of his prior most serious offense when he pleaded guilty to the prior offense, his claim is not sufficient to demonstrate facial invalidity of his conviction, and thus his claim fails. *See Ammons*, 105 Wn.2d at 189.

Contrary to Robinson's claim, a sentencing proceeding is not the proper arena for postconviction relief based on ineffective assistance of counsel for a prior guilty plea. *See Ammons*, 105 Wn.2d at 188. Robinson's recourse, if any, is to challenge the constitutionality of his guilty plea and conviction collaterally with a personal restraint petition under RAP 16.3. Robinson's present challenge to his prior guilty plea fails.[17]

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Rowland next argues that defense counsel provided ineffective assistance when he withdrew the requested affirmative defense instruction to which Rowland was entitled under RCW 9A.32.030(1). The State does not dispute that Rowland was entitled to the affirmative defense

---

[17] The State, in oral argument, also addressed *Boykin v. Alabama* as a potentially relevant case. 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). But *Boykin* fails to resolve the issue presented here. Although *Boykin* provides the rule that valid pleas must be made knowingly, voluntarily, and intelligently, it does not help to establish when a conviction based on a plea is *facially invalid*. 395 U.S. at 242.

instruction, but the State argues that (1) counsel pursued a tactically reasonable general denial rather than pursuing an affirmative defense and (2) Rowland was not prejudiced because if he had argued the affirmative defense, that argument would have failed. We agree with both of the State's arguments.

## A. STANDARD OF REVIEW

Ineffective assistance of counsel is a mixed question of law and fact that we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). Rowland bears the burden of establishing ineffective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). To establish a claim of ineffective assistance of counsel, Rowland must show that (1) defense counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Grier*, 171 Wn.2d at 33-34. "A failure to satisfy either prong is fatal to an ineffective assistance of counsel claim." *State v. McLean*, 178 Wn. App. 236, 246, 313 P.3d 1181 (2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

We presume that defense counsel's performance was reasonable. *Grier*, 171 Wn.2d at 33. "[P]erformance is deficient if it falls 'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland*, 466 U.S. at 688). Counsel's conduct is not deficient when it can be characterized as legitimate trial strategy or tactics. *Grier*, 171 Wn.2d at 33.

A defendant establishes prejudice by showing that there is a reasonable probability that the result of the proceeding would have been different but for counsel's unprofessional errors. *Grier*, 171 Wn.2d at 34. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Grier*, 171 Wn.2d at 34 (quoting *Strickland*, 466 U.S. at 694).

## B. REASONABLE TACTICS

It is an affirmative defense to felony murder if the defendant was not the only participant in the underlying crime and

> (i) [d]id not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
> (ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and
> (iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and
> (iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

RCW 9A.32.030(1)(c).

Here, defense counsel's decision not to request an instruction on the affirmative defense to first degree murder can properly be characterized as a legitimate strategic or tactical decision. *See, e.g.*, *State v. Perez*, 166 Wn. App. 55, 62, 269 P.3d 372 (2012) (characterizing attorney's decision to not request an affirmative defense instruction as legitimate tactics); *State v. Hassan*, 151 Wn. App. 209, 218, 211 P.3d 441 (2009) (characterizing a decision to not request a lesser-included offense jury instruction as part of a legitimate all or nothing trial strategy).

Rowland's defense was that he did not know about the plan to steal and he did not intend to steal or commit any crime when he went with friends to the stash house. And Rowland argued that because he did not know about the plan, he did not have the necessary mens rea to commit the underlying attempted robbery or burglary. 16 VRP 2158, 2162-63, 2171-72. Contrary to Rowland's defense, the "unarmed accomplice" affirmative defense would have required Rowland to *concede participation* in the underlying felony and then defend against the felony murder by establishing that he did not know other participants were armed or intended to cause bodily harm

36

to others. RCW 9A.32.030(1) (requiring the defendant to prove that he is not the "only participant in the underlying crime").

Given that Rowland denied any participation in the underlying felonies, counsel employed a legitimate tactic by attacking the State's case in chief rather than advancing an affirmative defense that was contradictory to Rowland's general denial. *See Hassan*, 151 Wn. App. at 218. The general denial was tactically reasonable and counsel was not deficient.

## C. NO PREJUDICE

Rowland argues that he was prejudiced by counsel's failure to request the affirmative defense instruction because "the jury may have acquitted Mr. Rowland of first degree murder." Br. of Appellant (Rowland) at 14. But the mere *possibility* that the jury may have acquitted Rowland does not establish prejudice—instead, Rowland must show that there is a reasonable probability that the outcome of the trial would have been different. *Grier*, 171 Wn.2d at 34. He has failed to do so.

As the State asserts, Rowland would have needed to prove, among other elements, that he "[h]ad no reasonable grounds to believe that any other participant was armed" in order to prevail on the affirmative defense. CP at 231(3). However, all of the evidence at trial, including Rowland's own testimony, shows that he believed at least one accomplice had a gun. Rowland himself testified that he believed someone in the group of accomplices was armed. This was corroborated by the State's evidence that Robinson's, Gaytan-Gutierrez's, and Mendez's guns were visible in Rowland's presence as they prepared to enter the apartment. Moreover, the State presented testimony that when Rowland arrived at the apartment, the occupants of his car and the occupants of Robinson's car got out with the guns previously handed out to them at Calo's garage.

Considering the undisputed evidence that Rowland reasonably believed that another participant was armed, Rowland had nothing to support a necessary element of the affirmative defense. Because there is not a reasonable probability that Rowland would have successfully argued the affirmative defense, he was not prejudiced when defense counsel withdrew its request for the affirmative defense instruction. *See Grier*, 171 Wn.2d at 34.[18]

### ISSUES RAISED IN BOTH ROBINSON'S AND ROWLAND'S STATEMENTS OF ADDITIONAL GROUNDS

### I. "TO-CONVICT" INSTRUCTION

Robinson and Rowland argue that the trial court's to-convict instruction for first degree attempted robbery omitted an essential element of first degree robbery, and the omission unconstitutionally relieved the State of its burden to prove an element beyond a reasonable doubt. We hold that the instruction was not erroneous because it did not omit an essential element of attempted robbery.

### A. PRINCIPLES OF LAW

"We review alleged errors of law in jury instructions de novo." *State v. Fehr*, 185 Wn. App. 505, 514, 341 P.3d 363 (2015). A jury instruction is erroneous if it relieves the State of its burden to prove every element of a crime. *State v. DeRyke*, 149 Wn.2d 906, 912, 73 P.3d 1000 (2003). "A 'to-convict' instruction must contain all the essential elements of the crime 'because

---

[18] Rowland also argues that under *In re Personal Restraint of Hubert*, 138 Wn. App. 924, 932, 158 P.3d 1282 (2007), Rowland was prejudiced when defense counsel failed to request the sole available defense to felony murder where there was ample evidence to support it. But as discussed above, there was not ample evidence to support one of the elements of the defense, so Rowland was not prejudiced when defense counsel withdrew its request for the "unarmed accomplice" instruction.

it serves as a yardstick by which the jury measures the evidence to determine guilt or innocence.'" *State v. Nelson*, 191 Wn.2d 61, 74, 419 P.3d 410 (2018) (internal quotation marks omitted) (quoting *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997)). An attempt crime has only two elements: (1) intent to commit a specific crime and (2) taking a substantial step to commit that crime. *Nelson*, 191 Wn.2d at 74. While they should be provided elsewhere in the instructions, the elements of the crime attempted do not need to be provided in the "to-convict" instruction itself. *Nelson*, 191 Wn.2d at 74.

"An omission of an essential element from the jury instructions may be harmless when it is clear that the omission did not contribute to the verdict." *State v. Schaler*, 169 Wn.2d 274, 288, 236 P.3d 858 (2010). For example, omission of an essential element is harmless when the omitted element is supported by uncontroverted evidence. *Schaler*, 169 Wn.2d at 288.

A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime. RCW 9A.28.020.

### B. NOT ESSENTIAL ELEMENT

Washington's common law of robbery is that a defendant cannot be convicted of robbery unless the victim has an ownership, representative, or possessor interest in the property taken. *Nelson*, 419 P.3d at 417. But the statutory definition of the crime of robbery does not require that the victim have the ownership, representative, or possessory interest in the property. *Nelson*, 419 P.3d at 417; RCW 9A.56.190. And in an attempt prosecution the common law element of representative interest does not come in to play. *Nelson*, 419 P.3d at 417.

Here, Robinson's charged crime, and the crime for which the court provided instructions, was *attempted* robbery, not the completed crime of robbery. Our Supreme Court has held that proof of an attempted robbery requires only proof of intent to commit robbery and a substantial step toward carrying out that intent. *Kier*, 164 Wn.2d at 807. In order to prove that Robinson intended to commit robbery, the State did not need to prove each independent element of robbery— it needed to prove that he only intended to commit the robbery and took a substantial step toward the commission of robbery. *Kier*, 164 Wn.2d at 807.

Instruction 33 properly instructed the jury regarding the elements of attempted robbery. The instruction stated in relevant part,

> To convict co-defendant Robinson of the crime of attempted robbery in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about November 12, 2012, the defendant did an act that was a substantial step toward the commission of robbery in the first degree;
> (2) That the act was done with the intent to commit robbery in the first degree; and
> (3) That the act occurred in the State of Washington.

CP at 805.

This instruction properly stated the essential elements of attempted robbery. RCW 9A.56.190. In addition, uncontroverted evidence supports that the victim had a sufficient ownership and representative capacity over the property, rendering harmless the absence of this element in the to-convict instruction. *See Schaler*, 169 Wn.2d at 288. Hidalgo Mendoza testified that Diaz-Solis owned the drugs and prepared them for sale. Hidalgo Mendoza also testified that the cash and drugs stored in the house belonged to Diaz-Solis. Thus, uncontroverted evidence

established that Diaz-Solis was a person who owned the property and exercised control, custody, or management over the property.

Because the elements of *attempted* robbery were properly articulated in the "to-convict" instruction, Robinson's and Rowland's claims fail.

## II. SUFFICIENT EVIDENCE

Robinson and Rowland both argue that sufficient evidence does not support some of their convictions. Their sufficiency claims fail.

### A. PRINCIPLES OF LAW

We review sufficiency of the evidence de novo. *Berg*, 181 Wn.2d at 867. When reviewing sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the crime's essential elements beyond a reasonable doubt. *Berg*, 181 Wn.2d at 867. We assume all of the State's evidence and any reasonable inferences from it are true, and all reasonable inferences from the evidence must be drawn in the State's favor and interpreted most strongly against the defendant. *Homan*, 181 Wn.2d at 106. Circumstantial evidence and direct evidence are equally reliable. *Delmarter*, 94 Wn.2d at 638. Credibility determinations are for the trier of fact and are not subject to appellate review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). We defer to the jury to resolve issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. *Rodriquez*, 187 Wn. App. at 930.

### A. ROBINSON SUFFICIENT EVIDENCE

Robinson asserts that sufficient evidence does not support that he committed any crimes. Specifically, he argues that because the State's witnesses were not credible and because the State

did not present evidence of the gun he used and did not provide deoxyribonucleic acid (DNA) linking Robinson to the crime scene, the State failed to prove beyond a reasonable doubt that he committed any crime. These arguments fail.

Robinson's arguments about State witnesses' credibility fail because credibility determinations by the jury are unreviewable. *Rodriquez*, 187 Wn. App. at 930. And although Robinson is correct that the State did not submit the murder weapon into evidence and did not provide DNA linking Robinson to the crime scene, that specific evidence is not mandatory to support any of the crimes with which Robinson was charged.

Because we do not review credibility determinations and because the absence of a murder weapon and DNA evidence do not render the evidence insufficient, Robinson's arguments fail.

B. ROWLAND ACCOMPLICE LIABILITY AND SUFFICIENT EVIDENCE

Rowland appears to argue that the State failed to prove beyond a reasonable doubt that he committed burglary and first degree murder.[19] We hold that sufficient evidence supports that Rowland was an accomplice to burglary and principal to felony murder.

1. FIRST DEGREE BURGLARY

Sufficient evidence supports that Rowland was an accomplice to first degree burglary.

An individual is guilty of first degree burglary as an accomplice if he or she aids in the burglary's planning or commission, knowing that his or her act will promote or facilitate the commission of the crime. RCW 9A.08.020(3); RCW 9A.52.020(1). The State must prove more

---

[19] His accomplice liability for attempted robbery is discussed above.

than a person's physical presence at the crime scene and assent to establish accomplice liability. *State v. Everybodytalksabout*, 145 Wn.2d 456, 472-73, 39 P.3d 294 (2002).

A person is guilty of first degree burglary if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, *the actor or another participant* in the crime (a) is armed with a deadly weapon or (b) assaults any person. RCW 9A.52.020(1).

Here, the State's testimony supports that Rowland knowingly provided aid in the commission of the burglary. *See* RCW 9A.08.020(3); RCW 9A.52.020(1). Rowland aided in the burglary when he drove Mendez and Gaytan-Gutierrez to the stash house, served as a lookout, and drove a getaway car for himself and two other participants. While at the stash house, Robinson, Gaytan-Gutierrez, and Mendez committed first degree burglary when they entered the apartment while Robinson was armed intending to steal from the apartment. RCW 9A.52.020(1). As such, Rowland's transportation of Gaytan-Gutierrez and Mendez, and him serving as a lookout, facilitated the commission of burglary. RCW 9A.52.020(1); RCW 9A.08.020(3).

Rowland's aid was knowing because he was aware from previous discussions that the group planned to steal drugs, and Calo offered Rowland money if he agreed to participate. Moreover, Mendez and Gaytan-Gutierrez explained the plan to Rowland during the drive to the house, telling him that they were going to the stash house to take the drugs and tie up anyone in the house for Calo to kill, and Rowland continued to drive the group, walk with the group to the house, stand as a lookout, and drive the getaway car.

Rowland asserts that accomplice liability cannot support his conviction for first degree burglary because the "to-convict" instruction listed the elements of first degree burglary but did

not indicate that Rowland could be convicted of first degree burglary as an accomplice. He argues that the absence of accomplice liability from the "to-convict" instruction means that an essential element of the crime was missing. This argument fails because a "to-convict" instruction does not need to include the instruction for accomplice liability as long as the jury is provided a separate instruction on accomplice liability. *State v. Teal*, 152 Wn.2d 333, 3339, 96 P.3d 974 (2004). Here, the jury was properly instructed regarding accomplice liability, so the instructions were proper. *See Teal*, 152 Wn.2d at 339.

Sufficient evidence supports that Rowland committed first degree burglary as an accomplice. RCW 9A.08.020(3); RCW 9A.52.020(1).

2.      FIRST DEGREE MURDER

Rowland also appears to assert that sufficient evidence does not support his conviction for first degree murder. This argument fails.

A person commits first degree murder when he commits an enumerated crime (including first degree burglary or first degree attempted robbery) and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants. RCW 9A.32.030(1)(c).

Here, as discussed above, Rowland committed both first degree robbery and first degree burglary. And the State's testimony established that in the course of committing these crimes, another participant, Robinson, shot and killed Diaz-Solis. As such, sufficient evidence supports that Rowland committed first degree murder. RCW 9A.32.030(1)(c).

III. PROSECUTORIAL MISCONDUCT

Robinson and Rowland argue that the prosecutor engaged in misconduct during closing argument. Because the State's challenged arguments were proper argument based on the evidence presented at trial, the prosecutorial misconduct claim fails.

A. PRINCIPLES OF LAW

"'Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard.'" *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014) (quoting *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)). "The defendant bears the burden of showing that the comments were improper and prejudicial." *Lindsay*, 180 Wn.2d at 430. If the defendant fails to object to the State's conduct or fails to request a curative instruction at trial, "the issue of misconduct is waived unless [it] was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Lindsay*, 180 Wn.2d at 430.

We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). "However, a prosecutor may not make statements that are unsupported by the record and prejudice the defendant." *State v. Jones*, 71 Wn. App. 798, 808, 863 P.2d 85 (1993).

B. ROBINSON'S PROSECUTORIAL MISCONDUCT CLAIM

Robinson argues that the prosecutor engaged in misconduct when he argued that cell phone records supported that Robinson was present at the crime scene at the time the shooting took place.

He argues this is manifestly prejudicial because the prosecutor insinuated that he had personal knowledge that he did not possess. The State's challenged statements about cell phone records were appropriate argument based on the evidence.

Robinson appears to challenge the State's closing argument asserting, based on Robinson's cell phone records, that there were six cell phone calls between Uscanga Fernandez and Robinson after 9:46 PM on November 12 "[a]nd they were using Cell Tower 413, which is the cell tower that serves the area of where the crime scene is." 19 VRP at 2489. This statement was proper argument based on the evidence because testimony and exhibits supported that Robinson made and received calls immediately after the time of the shooting using a tower that serves the area of the crime scene.

Because the State's argument about cell phone data was supported by the evidence, Robinson has failed to establish that the State engaged in misconduct.

## C. ROWLAND'S PROSECUTORIAL MISCONDUCT CLAIM

Rowland challenges numerous of the prosecutor's statements during closing arguments. Each of Rowland's prosecutorial misconduct allegations fails because the State engaged in appropriate argument supported by the evidence.

1. STATEMENT THAT ROWLAND WAS A LOOKOUT AND SAW A GUN

Rowland asserts that the prosecutor engaged in misconduct when he argued that Rowland knew another participant was armed with a gun during the break-in, that he saw multiple guns in the garage before they left to the stash house, and that he acted as a lookout to aid the commission of the robbery and burglary.

46

Testimony supports each of the prosecutor's challenged arguments. Smith testified that after the group arrived to the back of the apartment, Rowland was standing apart from the group serving as a lookout. Rowland testified on cross-examination that he had previously told law enforcement that he saw multiple people armed with guns in Calo's garage on November 12. And Rowland testified that he believed at least one other person carried a gun during the commission of the robbery and burglary. As such, the State's arguments that Rowland served as a lookout, saw multiple people were armed in Calo's garage, and knew another participant was armed during the break-in were proper arguments based on the evidence.

2.      STATEMENTS REGARDING ROWLAND'S TESTIMONY AND DEFENSE

Rowland argues that the prosecutor engaged in misconduct when he summarized Rowland's testimony that he was present during the crime but did not have knowledge of the crime. Specifically, Rowland challenges the following statement:

> And, in terms of Michael Rowland, you have his own words. He was a part of that group. He drove two people there. He walked all the way from the one apartment complex parking lot, down the road, around the buildings, down in front and around the back. He saw them huddle up. He saw them looking for a way in. He saw the guns. He never left until things went wrong. And he says he saw all of those things. His defense is I just didn't get it.

19 VRP at 2484 (quoted in Rowland SAG at 24).

Rowland argues that this was misconduct because it misrepresented his testimony and used words that he never used.

However, the State, in summarizing Rowland's testimony, properly argued based on the testimony that Rowland admitted to the acts alleged by the State but denied having the knowledge necessary to commit any crime. Rowland testified that he met Gaytan Gutierrez and Mendez at Calo's garage and agreed to drive them to Lakewood. He drove them to the stash house, but

testified that he did not know where they were going specifically or why they were driving there. Rowland followed Mendez and Gaytan Gutierrez to the back of the apartment, but he claimed he did not know where they were walking or why they were walking there. As the group formed together behind the house, with Rowland standing separately, he saw a gun in someone's hand. He fled after others in the group entered the apartment and after he heard the gunshot.

Because the State's argument was properly based on Rowland's testimony, Rowland has failed to establish that the prosecutor engaged in misconduct.

3. STATEMENTS ABOUT ROWLAND'S KNOWLEDGE

Rowland also argues that the prosecutor improperly argued that Rowland knew they were going to commit an armed burglary. As discussed at length above when addressing sufficiency of the evidence, testimony supports that Rowland knew the group intended to steal from the house, and he knew others were armed. As such, the State's argument was proper based on the evidence. *See Hoffman*, 116 Wn.2d at 94-95.

## IV. TOO VAGUE TO ADDRESS

Robinson and Rowland both raise arguments that are too vague to address.

We cannot review a SAG claim if it is too vague to properly inform the court of the claimed error. *State v. Bluehorse*, 159 Wn. App. 410, 436, 248 P.3d 537 (2011). We do not make arguments for the parties. *Coats*, 173 Wn.2d at 138.

Here, Robinson argues that (1) the trial court violated various constitutional rights when it failed to record sworn testimony, (2) Robinson "tried to present an alibi but had no defense against perjured testimony by co-defendants" (Robinson SAG at 2), other suspects were unfairly given plea agreements in exchange for their testimony, (4) defense counsel provided ineffective

assistance when he failed to present mitigating evidence at sentencing, (5) defense counsel was ineffective for failing to suppress prejudicial testimony of no probative value, (6) Robinson's due process rights were violated because the State used compelled testimony from co-defendants with felony records, (7) Smith and Mendez offered false, tainted testimony and Robinson was "forced" to testify to refute the false testimony, (8) witnesses were not credible because they had criminal histories or received plea deals, and (9) Detective Catlett "did not respect the truth finding process" and prosecuted people without evidence (Robinson SAG at 12).

Rowland argues that (1) he would like the court to "review this case for future possible civil suits" (Rowland SAG at 12), (2) the trial court engaged in "abuse of discovery [and] abuse of discretion," and the State engaged in prosecutorial misconduct related to Rowland's extradition (Rowland SAG at 12), (3) the prosecutor misquoted him during closing argument, (4) the prosecutor made statements to divert the jury from its duty to decide the case on the evidence, (5) there was new evidence of extradition irregularities such that his counsel should have raised another suppression motion before the second trial, (6) he was not given a fair trial and Pierce County initiated and maintained a malicious prosecution to gain a conviction, as evidenced by the conviction rate and appeal rate in Pierce County, (7) the prosecution knowingly used perjured testimony by Mendez after visiting him in jail during trial, (8) the State used false evidence and false testimony, and (9) Robinson's counsel made a motion based on statements made by Rowland's counsel and Rowland's counsel said he would "leave it up to the appellate attorney" (Rowland SAG at 28).

Because these arguments are too vague to inform us of the claimed error, we do not address them further. *Bluehorse*, 159 Wn. App. at 436.

49

## V. MATTERS OUTSIDE THE RECORD

Robinson argues that evidence about his cell phone records is "fruit[] of the poisonous tree" because he claims he was subject to an invalid warrantless arrest in June 2013. Robinson SAG at 20. And he argues that he was not provided equal protection because he was not offered an opportunity to plead guilty in exchange for a reduced sentence but his co-defendants were. "Where, as here, the claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record." *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Robinson's challenges to an invalid warrantless search and others' plea deals refer to matters outside the record, and we do not address them further. *McFarland*, 127 Wn.2d at 335.

Rowland also asserts that Catlett engaged in misconduct by failing to follow internal police department policies regarding documentation of police reports. To the extent Rowland refers to Catlett's misconduct related to violation of policies, his argument was not preserved under RAP 2.5, and he refers to matters outside the record. As such, we do not address his claim further. *McFarland*, 127 Wn.2d at 335.

## ROBINSON SAG

## I. ER 403

Robinson appears to assert that the trial court erred under ER 403 because the probative value of testimony by six law enforcement officers was outweighed by unfair prejudice. He argues that the six officers' testimony was not probative because it was irrelevant and cumulative, and he argues that it was unfairly prejudicial because the "sheer number of uniformed officers presented" resulted in "guilt by association." Robinson SAG at 9. We hold that Robinson's argument is waived under RAP 2.5.

A. PRINCIPLES OF LAW

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. ER 403. A danger of unfair prejudice exists when "evidence is likely to stimulate an emotional response rather than a rational decision." *State v. Beadle*, 173 Wn.2d 97, 120, 265 P.3d 863 (2011). "[T]he burden of demonstrating unfair prejudice is on the party seeking to exclude the evidence." *State v. Burkins*, 94 Wn. App. 677, 692, 973 P.2d 15 (1999). Under ER 403, "police officers are allowed to testify in uniform, even if their presence is prejudicial to a defendant." *Carson v. Fine*, 123 Wn.2d 206, 224, 867 P.2d 610 (1994).

On appeal, a party may raise only objections that are properly preserved, unless the party demonstrates manifest constitutional error. *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). Courts will not reverse the trial court's decision to admit evidence where the defendant argues for reversal based on an evidentiary rule not raised at trial. *State v. Korum*, 157 Wn.2d 614, 648, 141 P.3d 13 (2006) (plurality opinion); *Powell*, 166 Wn.2d at 82. The defendant has the initial burden of showing that an alleged error was manifestly unconstitutional. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). A defendant cannot simply assert that an error occurred at trial and label the error "constitutional"; instead, he must identify an error of constitutional magnitude and show how the alleged error actually affected his rights at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011).

### B. ROBINSON'S ER 403 ARGUMENT WAIVED

Here, Robinson's counsel did not object under ER 403 to the admission of any law enforcement testimony that was admitted at trial. As such, Robinson's ER 403 claim was not properly preserved. *See Powell*, 166 Wn.2d at 82. And Robinson has not established that admission of the testimony of the numerous uniformed officers is a manifest constitutional error. As such, Robinson's ER 403 claim is waived. RAP 2.5(a)(3).[20]

### II. POLICE MISCONDUCT

Robinson appears to argue that Detective Catlett engaged in misconduct and witness tampering during an interrogation of Uscanga Fernandez that occurred prior to trial. Robinson alleges that Detective Catlett prejudiced the jury and engaged in witness tampering when, during interrogation, Uscanga Fernandez identified a photo as being Robinson only after Catlett suggested that Robinson was the person in the photograph.

Robinson's argument fails because it is based on the assumption that Uscanga Fernandez's testimony was tainted and that Robinson was prejudiced by that testimony. Here, the jury never heard evidence suggesting that Uscanga Fernandez identified Robinson during an interrogation. Instead, at trial, Uscanga Fernandez was *unable* to identify Robinson in a photo array on both

---

[20] Robinson asserts repeatedly that the police testimony *in general* was unfairly prejudicial. We cannot review a SAG claim if it is too vague to properly inform us of the claimed error. *Bluehorse*, 159 Wn. App. at 436. To the extent that Robinson does not challenge *specific* police testimony, his claims are too vague to address. *State v. Hand*, 199 Wn. App. 887, 901, 401 P.3d 367 (SAG argument regarding ineffective assistance of counsel was too vague to address where defendant did not "complain of specific actions taken by defense counsel or argue that defense counsel should have done something differently."), *review granted*, 189 Wn.2d 1024 (2017).

direct and cross-examination, and he was unable to identify that Robinson was present in the court room. As such, the jury observed that Uscanga Fernandez *could not* identify Robinson by sight.

To the extent Robinson argues that he was prejudiced by Detective Catlett's alleged "tampering" of Uscanga Fernandez that allegedly occurred during a prior interrogation, his claim fails.

ROWLAND SAG

I. EXTRADITION—MOTION TO DISMISS

Rowland argues that his motion to dismiss all charges against him should have been granted because the State violated his due process rights when it allegedly failed to comply with Oregon's extradition statute before transporting him from Oregon to Washington. Because violation of Oregon's extradition statute is not a due process violation, Rowland's claim fails.

A. PRINCIPLES OF LAW

We review a trial court's denial of a motion to dismiss for abuse of discretion. *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). Under this standard, a court abuses it discretion when its decision is manifestly unreasonable or based on untenable grounds. *Blackwell*, 120 Wn.2d at 830.

Oregon law provides the extradition procedures for returning arrestees to other states. OR. REV. STAT., ch. 133; *see State v. Bonds*, 98 Wn.2d 1, 7-8, 653 P.2d 1024 (1982). Failure to comply with Oregon extradition proceedings before transporting an arrestee to Washington State does not constitute a violation of due process and does not support application of the exclusionary rule. *Bonds*, 98 Wn.2d at 14.

#### B. NO ABUSE OF DISCRETION

Here, the trial court relied on *Bonds* when it denied Rowland's motion to suppress, holding that "[o]ur Supreme Court apparently finds the extradition proceedings without a judicial hearing [are] appropriate" such that dismissal was not warranted. 1 VRP at 67.

In *Bonds*, our Supreme Court considered whether a defendant's due process rights were violated when Vancouver police officers removed an arrestee from Oregon to Washington after making "no attempt to comply with Oregon extradition procedures." 98 Wn.2d at 8. The court also considered whether it was an appropriate remedy to exclude statements made after an extradition that failed to comply with Oregon law. *Bonds*, 98 Wn.2d at 14. The court concluded that violations for Oregon's extradition procedures do not constitute a due process violation and do not support application of the exclusionary rule. *Bonds*, 98 Wn.2d at 14.

Rowland's June 2016 motion to dismiss relied on the argument that law enforcement's failure to comply with Oregon extradition procedures constituted a due process violation for which dismissal was the only appropriate remedy. Based on *Bonds*, the trial court properly concluded that violation of Oregon extradition procedures is *not* a violation of due process for which extreme remedies, such as exclusion or dismissal, is appropriate. 98 Wn.2d at 14.

The trial court's denial of Rowland's motion to suppress was proper because it was based on tenable grounds and reasons supported by *Bonds*. 98 Wn.2d at 14.[21]

---

[21] Rowland also makes numerous references and citations to the Uniform Criminal Extradition Act, ch. 10.88 RCW. This is a model law promulgated by the Uniform Law Commission and is not a source of law providing rights or procedures binding on government officials. RCW 43.56.020.

## II. EXTRADITION: SUPPRESSION

Rowland argues that statements he made during his transport from Oregon to Washington should have been suppressed as "fruit[] of a poison[ous] tree" resulting from his extradition that was not compliant with Oregon statutory extradition procedure. Rowland SAG at 11. This claim fails.

"Generally, evidence seized during an illegal search is suppressed under the exclusionary rule." *State v. Gaines*, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005). "In addition, evidence derived from an illegal search may also be subject to suppression under the fruit of the poisonous tree doctrine." *Gaines*, 154 Wn.2d at 717.

Rowland has failed to establish that the State engaged in an illegal search that would justify application of the fruit of the poisonous tree doctrine. In addition, failure to comply with statutory extradition procedures is not grounds for application of the exclusionary rule. *Bonds*, 98 Wn.2d at 14. As such, Rowland's suppression argument fails.[22]

## III. ALLEGED *BRADY* VIOLATIONS

Rowland appears to assert that the State committed two *Brady*[23] violations. These arguments fail.

In *Brady*, the United States Supreme Court held that a prosecutor's suppression of an accomplice's murder confession violated the defendant's due process rights under the Fourteenth Amendment. The Supreme Court held that "suppression by the prosecution of evidence favorable

---

[22] Rowland's suppression argument is also arguably unpreserved, as Rowland did not raise this argument about extradition in his suppression motion below.

[23] *Brady v. Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

To establish a *Brady* violation, the defendant must establish that (1) the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the evidence is material, meaning that the evidence must have resulted in prejudice to the accused. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Prejudice occurs "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)).

Here, Rowland alleges that the State violated *Brady* because it failed to produce (1) a photo montage used in an interrogation in which law enforcement was seeking identification of Rowland's co-defendant Robinson and (2) the second page of the form Rowland signed in Oregon consenting to his removal from Oregon by Washington law enforcement. Rowland has failed to establish that these pieces of evidence are material, so his *Brady* claims fail.

First, Rowland has not established that the photo montage was material to his own case. Although the record suggests that there was a photo montage missing from discovery, Robinson's (not Rowland's) defense counsel raised the issue and requested that the State produce the evidence at issue. The montage at issue was referenced in an interrogation transcript available to the defense, and it is evident that the montage was used in an effort to identify co-defendant Robinson. Rowland does not explain how a photo montage used in an effort to identify *his co-defendant* has any bearing on his own case. As such, he has failed to show a "'reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *Bagley*, 473 U.S. at 682).

Second, Rowland has failed to establish that the second page of the form he signed consenting to his removal from Oregon was material. During his motion to dismiss, Robinson alleged that his waiver of Oregon's statutory extradition processes was invalid. As discussed above, the trial court concluded that even if the waiver was invalid, violation of Oregon's statutory procedures was not a due process violation and did not support dismissal. Thus, the trial court assumed Rowland's waiver was invalid and still denied his motion. Rowland fails to establish that the outcome of his motion to dismiss would have been different if he had access to the second page of the waiver form. *Strickler*, 527 U.S. at 280.

## IV. ROWLAND'S PRIOR STATEMENT

Rowland appears to argue that the trial court erred when it allowed the State to question him about a prior statement that he made to Detectives Catlett and Bunton during the drive from Oregon to California. Because the statement was properly admitted evidence of a prior inconsistent statement and a statement by a party opponent, Rowland's claim fails.

### A. PRINCIPLES OF LAW

The State may impeach witnesses, including the defendant, as to their credibility by a prior inconsistent statement. *State v. Garland*, 169 Wn. App. 869, 885, 282 P.3d 1137 (2012). "'Impeachment is evidence, usually prior inconsistent statements, offered solely to show the witness is not truthful.'" *Garland*, 169 Wn. App. at 885 (quoting *State v. Burke*, 163 Wn.2d 204, 219, 181 P.3d 1 (2008)). When a prior inconsistent statement is an admission by a party opponent,

the statement may be used as both impeachment and substantive evidence. *Garland*, 169 Wn. App. at 885-86.

### B. PRIOR STATEMENT PROPERLY ADMITTED

Here, Rowland's prior statement was properly admitted as a prior inconsistent statement and a statement by a party opponent. Rowland denied that he had knowledge of the plan to steal from the stash house, and the trial court concluded that his prior statement criticizing the plan was probative of whether he had knowledge of that plan. When the State asked Rowland about the prior statement, he admitted that he made the statement but claimed that he was joking. As a rebuttal witness, Detective Catlett testified that Rowland was not joking when he made the statement criticizing Calo's plan.

The trial court did not abuse its discretion when it concluded that Rowland's prior statement was admissible. Because the prior statement was made by Rowland himself, it was a statement of a party opponent that could be reasonably considered as both impeachment and substantive evidence. *Garland*, 169 Wn. App. at 885-86; ER 801(d)(2).[24]

### V. MOTION FOR NEW TRIAL

Rowland argues that his motion for a new trial for irregularities in the proceedings should have been granted. This argument fails.

At sentencing, Rowland's counsel moved for a new trial on the basis that (1) the "to-convict" instructions for first degree murder and attempted robbery required Rowland to commit the crime as a principal and did not authorize conviction as an accomplice because they did not

---

[24] Rowland also argues that the State engaged in misconduct when it asked Rowland and Catlett about Rowland's prior statement. Because the State does not commit misconduct when it asks questions about properly admitted evidence, Rowland's argument fails.

58

explicitly mention accomplice liability, (2) sufficient evidence did not support his convictions for first degree murder and first degree attempted robbery, and (3) the State improperly admitted Rowland's prior statement criticizing the participants' plan. The trial court denied the motion.

We review the denial of a motion for a new trial for abuse of discretion. *State v. Balisok*, 123 Wn.2d 114, 117, 866 P.2d 631 (1994). Abuse occurs where the decision is based on untenable grounds or made for untenable reasons. *State v. Quismundo*, 164 Wn.2d 499, 504, 192 P.3d 342 (2008). In a criminal proceeding, a new trial is necessary only when the defendant has been so prejudiced that only a new trial can ensure that the defendant will be treated fairly. *State v. Roberts*, 142 Wn.2d 471, 533, 14 P.3d 713 (2000).

Here, the trial court did not provide detailed reasons for why it denied Rowland's new trial motion. However, as addressed in detail above, each of the arguments raised in the new trial motion fails. Specifically, (1) the "to-convict" instructions were proper under *Teal* because they did not need to refer to accomplice liability, given that the jury was properly instructed on accomplice liability, (2) sufficient evidence supported Rowland's convictions, and (3) the court properly admitted Rowland's prior statement.

Because each argument in Rowland's new trial motion fails, the trial court had tenable grounds and reasons for denying the motion. As such, Rowland's challenge to the trial court's denial of his new trial motion fails. *See Balisok*, 123 Wn.2d at 117.

## VI. CUMULATIVE ERROR

Rowland asserts that the "accumulation of errors" identified in his SAG entitles him to a new trial. Rowland SAG at 28. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*,

174 Wn.2d 741, 766, 278 P.3d 653 (2012). As discussed above, Rowland was not affected by multiple errors. He is therefore not entitled to a new trial based on cumulative error.

We remand for the trial court to vacate Robinson's attempted robbery conviction but affirm all other convictions and sentences.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PENOYAR, J.P.T.

We concur:

BJORGEN, P.J.

SUTTON, J.